## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**NATIONAL LABOR RELATIONS BOARD:**

          Applicant,        :

                      :

          v.               :    Misc. No. 05-

                      :

**JOHN BOYD and ACTION TEMPORARY** :
**EMPLOYMENT a/k/a ACTION**        :
**MULTI-CRAFT**                   :

                      :

          Respondent.      :

## MOTION FOR ORDER TO SHOW CAUSE

The National Labor Relations Board "the Board", an administrative agency of the Federal Government, by and through Colm F. Connolly, United States Attorney for the District of Delaware, and Douglas E. McCann, Assistant United States Attorney for the District of Delaware, and by its General Counsel, and by Daniel E. Halevy, its Regional Attorney for the Fourth Region, respectfully applies to this Court, pursuant to the National Labor Relations Act, as amended (29 U.S.C., Section 151 *et seq.*) herein called the Act, for an order compelling John Boyd, President of Action Temporary Employment a/k/a Action Multi-Craft ("Respondent"), to obey a certain subpoena issued by the Board and served upon him in the manner provided by law. This Application is made under Section 11(2) of the Act (29 U.S.C. § 161(2)). In support of this Application, the Board respectfully states as follows:

(a)      This Court has jurisdiction of the person of John Boyd by virtue of Section 11(2) of the Act. Respondent is a domestic corporation chartered under the laws of the United States and licensed to do business in the State of Delaware within this judicial district, having maintained an office for that purpose at the 207 Louis Lane, Hockessin, Delaware.

(b)     Pursuant to the provisions of Section 6 of the Act, the Board has issued Rules and

Regulations (Series 8, as amended, herein called the "Board's Rules") governing the conduct of

its operations, which Rules have been duly published in the Federal Register (24 F.R. 9095), as

provided for in the Administrative Procedure Act (5 U.S.C. § 552). This Court may take judicial

notice of the Rules by virtue of 44 U.S.C. § 1507.

(c)     Pursuant to the provisions of Section 10(b) of the Act, there is now pending

before the Board, an investigation concerning Respondent's compliance with a Decision and

Order of the Board and an enforcing Judgment of the United States Court of Appeals for the

Third Circuit. *NLRB v. Action Temporary Employment a/k/a Action Multi-Craft.*, No. 02-3157

(3d Cir. 2002, enfg. 337 NLRB 268 (2001)). Copies of the Order Granting Judgment by Default

of the Court of Appeals and of the Board's Decision and Order are attached hereto, made a part

hereof, and designated as Exhibits 1 and 2, respectively.

(d)     In relation to the proceeding described above in paragraph (c), the Board did cause

to be issued, on December 2, 2004, at the request of a representative of the General Counsel, a

subpoena duces tecum (No. B438191) directed to John Boyd, Respondent's President and agent,

and requiring John Boyd, inter alia, to appear before a Board Agent on December 16, 2004, at

10:00 a.m., in the Board's Offices at the Fourth Region, One Independence Mall, 615 Chestnut

Street, Seventh Floor, Philadelphia, Pennsylvania, and then and there give testimony and produce

certain records and documents more fully described in the subpoena attached hereto, made a part

hereof and designated as Exhibit 3. The subpoena was issued under the authority of, and in the

manner and form provided for, in Section 11(1) of the Act (29 U.S.C. § 161(1)).

(e)    This subpoena was personally served on John Boyd on December 8, 2004 at his

home address at 207 Louis Lane, Hockessin, Delaware, all in the manner and form provided for

in Section 11(4) of the Act (29 U.S.C. § 161(4)) and Section 102.111(a) of the Board's Rules.

The certification showing such service is on the reverse side of the subpoena and is attached

hereto, made a part hereof, and designated as Exhibit 4.

(f)    Although Section 11(1) of the Act and Section 102.31 of the Board's Rules

provide for a period of five days after service of a subpoena within which any person served with

the same may petition the Board to revoke the subpoena, neither John Boyd nor Respondent filed

a petition to revoke the subpoena within five (5) days. John Boyd failed to appear on

December 16, 2004 and failed to produce the records and documents required by the terms of the

subpoena.

(g)    The refusal of John Boyd to appear and produce the required records and

documents in obedience to the subpoena, which records and documents are related to the matter

under investigation in the proceeding before the Board, constitutes contumacious conduct and/or

a refusal to obey a subpoena within the meaning of Section 11(2) of the Act, and has prevented,

and is preventing, the Board from carrying out its duties and functions under the Act.

WHEREFORE, the Applicant, National Labor Relations Board, respectfully prays:

(1)    that an Order to Show Cause issue directing John Boyd to appear before this

Court on a date certain to be fixed in the Order, and that he show cause, if any exists, why an

Order should not issue directing him to appear before a Board Agent in the matter of *NLRB v.

Action Temporary Employment a/k/a Action Multi-Craft.*, No. 02-3157 (3d Cir. 2002, enfg. 337

NLRB 268 (2001)), at a time and place that the Board Agent may designate, and then and there

3

give testimony and provide records and documents relevant to the matter under investigation in the proceeding before the Board; and

(2)    that after considering arguments in response to the Order to Show Cause, this Court issue an Order compelling John Boyd to appear before a Board Agent at a time and place to be fixed by the Board Agent and then and there produce the records and documents referred to in the subpoena and give testimony and answer any and all questions related to the matters under investigation in the proceeding before the Board; and

(3)    that the Applicant, National Labor Relations Board, have such other and further relief as may be necessary and appropriate.

Respectfully submitted,

National Labor Relations Board

ARTHUR F. ROSENFELD
General Counsel

By: _Daniel C. Halevy_ ⍉ *By Den*
Daniel E.Halevy
Regional Attorney, Region Four
One Independence Mall, Seventh Floor
615 Chestnut Street
Philadelphia, Pennsylvania  19106
Telephone (215) 597-7615
Fax (215) 597-7658

Co-Counsel:

By: _Margarita Navarro-Rivera_ *By Den*
Margarita Navarro-Rivera,
Senior Field Attorney
Telephone:  (215) 597-3979

4

COLM F. CONNOLLY
United States Attorney

By: _____
Rudolph Contreras
Civil Chief
Rudolph.Contreras@usdoj.gov

By: _____
Douglas E. McCann
Assistant United States Attorney
Delaware Bar I.D. No. 3852
The Nemours Building
1007 Orange Street, Suite 700
Wilmington, DE  19899-2046
Tel:  302 573-6277
Fax:  302 573-6220
Douglas.McCann@usdoj.gov

# EXHIBIT  1

TOTAL P.02

UNITED STA    COURT OF APPEALS FOR THE THIR    RCUIT 4-CA- 23898

M 150

September 24, 2002

No. 02-3157

National Labor Relations Board,
                                        Petitioner

v.

Action Temporary Employment,
                                        Respondent

(Board Nos. 4-CA-23898, 4-CA-24026, 4-CA 23974 & 4-CA-24001)

Present:    SLOVITER, RENDELL and FUENTES, Circuit Judges

Motion by Petitioner, National Labor Relations Board, for Entry of Judgment by Default.

*Lynn M. Lopez*
Lynn M. Lopez
Case Manager (267)299-4922

Response was due 9/23/02.

—————————————— O R D E R ——————————————

The foregoing    is granted

By the Court,

Circuit Judge

Dated: NOV 1 2 2002

Lml\cc: TAAA
        (MAG
        (JRm
          (ORC
          (RSS

# EXHIBIT  2



NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Action Temporary Employment, a/k/a Action Multi-Craft *and* Local Union 654, International Brotherhood of Electrical Workers, AFL–CIO and Local Union 313, International Brotherhood of Electrical Workers, AFL–CIO and A-Bell Electric, Inc. and Action Temporary Employment, a/k/a Action Multi-Craft *and* Local Union 654, International Brotherhood of Electrical Workers, AFL–CIO and A-Bell Electric, Inc. and Action Temporary Employment, a/k/a Action Multi-Craft *and* Local Union 313, International Brotherhood of Electrical Workers, AFL–CIO.** Cases 4–CA–23898, 4–CA–24026, 4–CA–23974, and 4–CA–24001

December 20, 2001

## DECISION AND ORDER

### BY CHAIRMAN HURTGEN AND MEMBERS LIEBMAN AND WALSH

On June 30, 1997, Administrative Law Judge Karl H. Buschmann issued the attached decision. On December 13, 2000, the judge issued the attached supplemental decision. Respondent Action Temporary Employment[1] filed exceptions to the judge's initial decision and a supporting brief, and the General Counsel filed an answering brief in opposition to the Respondent's exceptions. The General Counsel filed exceptions and a supporting brief, the Respondent filed an answering brief in opposition to the General Counsel's exceptions, and the General Counsel filed a reply brief to the Respondent's answering brief. No exceptions were filed to the judge's supplemental decision.

The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions only to the extent consistent with

this Decision and Order,[3] and to substitute the attached notice.[*]

The facts, as more fully set forth in the judge's decision, are as follows.

The Respondent is an employment agency that recruits and hires temporary workers on behalf of its clients. In early 1995, union members from two local unions of the International Brotherhood of Electrical Workers (IBEW) submitted employment applications to the Respondent. One of the questions on the Respondent's application form inquired whether the applicant had been involved with a union. None of the applicants who revealed their union membership was considered for employment, while those who concealed their union affiliation were hired. One applicant who was being interviewed over the telephone was asked whether he was still with the Union. Finally, two union members, Robert Matsinger and James Conroy, who had been hired by the Respondent and referred to work on a project, went on strike for 3 days to protest the Respondent's unfair labor practices. They ended their strike and offered to return to work unconditionally, but were refused reinstatement to their jobs.

The judge found that the Respondent violated Section 8(a)(3) and (1) by refusing to consider and refer for employment members of the two local unions. He also found that both the question on the Respondent's application form and the inquiry to the applicant regarding his union activity constituted unlawful interrogations in violation of Section 8(a)(1). We adopt these findings by the judge, as well as his analysis. The judge, however, recommended dismissal of the complaint allegation that the Respondent unlawfully refused to reinstate employees Robert Matsinger and James Conroy. For the reasons set forth below, we reject this recommendation and find the Respondent's actions violated Section 8(a)(3) and (1) of the Act.

### The Refusal to Reinstate James Conroy and Rober Matsinger

#### A. Facts

James Conroy and Robert Matsinger were both members of IBEW Local 654, and Conroy additionally was

---

[1] Respondent A-Bell Electric, Inc. entered into an informal settlement agreement, and is not a party to these proceedings. All references to "Respondent" herein are to Action Temporary Employment.

[2] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products,* 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] We shall modify the judge's recommended Order in accordance with our recent decision in *Ferguson Electric Co., Inc.,* 335 NLRB No. 15 (2001).

[*] In the "Analysis" section of his initial decision, under "Refusal to Reinstate," par. 2, the judge incorrectly states that no picketing occurred on June 23. In that same paragraph, the judge inadvertently cites transcript page 282; the correct cite is page 262.

EXHIBIT 2

that Local's president.[4]  The Respondent hired Conroy and Matsinger and. on June 21, 1995,[5] referred them for employment at A-Bell Electric's Avon facility in Newark, Delaware.  The judge found, and we agree, that the Respondent and A-Bell are joint employers.

Conroy and Matsinger worked for A-Bell on June 21. On June 22 and 23, both employees went on strike to protest the Respondent's unfair labor practice of refusing to refer union applicants for employment.[6]  They also picketed the Avon jobsite on both days from 6:30 a.m. to 10:30 a.m. with placards stating, "Action Temporary Employment Service, unfair labor practice. Strike."

The Respondent concedes that A-Bell informed it of the picketing activity early in the morning of June 22, and that it thereafter went to the Avon site to meet with A-Bell.  The Respondent further admits that it knew that Conroy's and Matsinger's picketing was directed against it.

On Friday, June 25, Conroy and Matsinger reported to work at the Avon jobsite.  They informed A-Bell's foreman, Louis Wright, that they were unconditionally ending their strike and returning to work. The employees said that Wright then informed them, "You've been dismissed by Action and you've been permanently replaced by Tri-County Electric."[7]  Conroy and Matsinger left the Avon jobsite.  The following Monday they submitted their timecards to the Respondent and were paid.  The Respondent thereafter did not refer Conroy or Matsinger to any jobs.  In a subsequent letter to the Board's Regional Office, the Respondent argued that this nonreferral was consistent with its "policy that any worker leaving a job and failing to return thereafter *will not* be hired again." (Emphasis in original).

### B. Analysis

At issue here is whether the Respondent is liable for A-Bell's unlawful refusal to reinstate Conroy and Matsinger upon their unconditional offer to return to work from their unfair labor practice strike.

In *Capitol EMI Music*,[8] the Board analyzed the circumstances under which one joint employer will be liable for the unfair labor practices of another.  Specifically, the Board held that

[4] Both Conroy and Matsinger previously had submitted applications with the Respondent and, as found by the judge, were among the applicants that the Respondent unlawfully refused to hire.

[5] All dates are 1995 unless otherwise indicated.

[6] Previously, on June 6, IBEW Local 654 had filed an unfair labor practice charge alleging, inter alia, that the Respondent had unlawfully refused to refer its members for employment.  Locals 654 and 313 subsequently filed additional charges.

[7] The judge found that Conroy's and Matsinger's testimony, about what Wright said that the Respondent had told him, was hearsay.

[8] 311 NLRB 997 (1993), enfd. 23 F.3d 399 (4th Cir. 1994)(Table).

[I]n joint employer relationships in which one employer supplies employees to the other, we will find both joint employers liable for an unlawful employer termination (or other discipline short of termination) only when the record permits an inference (1) that the nonacting joint employer knew or should have known that the other employer acted against the employee for unlawful reasons and (2) that the former has acquiesced in the unlawful action by failing to protest it or to exercise any contractual right it might possess to resist it. [footnotes omitted] [311 NLRB at 1000].

In *Capitol EMI Music*, the Board also established the following allocation of evidentiary burdens for assessing whether a joint employer would be held liable for the unlawful conduct of the other:

The General Counsel must first show (1) that two employers are joint employers of a group of employees, and (2) that one of them has, with unlawful motivation, discharged or taken other discriminatory actions against an employee or employees in the jointly managed work force. The burden then shifts to the employer who seeks to escape liability for its joint employer's unlawfully motivated action to show that it neither knew, nor should have known, of the reason for the other employer's action or that, if it knew, it took all measures within its power to resist the unlawful action. [footnote omitted] [Id.]

The General Counsel argued to the judge that, under *Capitol EMI Music*, an inference should be drawn that A-Bell and the Respondent are jointly responsible for the unlawful refusal to reinstate unfair labor practice strikers Conroy and Matsinger after those two employees ended their strike and unconditionally offered to return to work at A-Bell on June 25.

The judge found that the General Counsel sustained its burden under *Capitol EMI Music* of proving the joint employer status of A-Bell and the Respondent, and that A-Bell took discriminatory action against Conroy and Matsinger by refusing to reinstate these unfair labor practice strikers.  The judge further concluded, however, that the Respondent met its rebuttal burden because the record failed to show that it knew or should have known that Conroy and Matsinger had made an unconditional offer to A-Bell to return to work.  On this basis, the judge recommended dismissing this portion of the complaint.

In his exceptions, the General Counsel argues that the judge improperly applied the standards set forth in *Capitol EMI Music*. The General Counsel contends that the Board emphasized in *Capitol EMI Music* that its holding —that the nonacting joint employer was not liable for the

other's unlawful act—was a narrow one. It rested on the finding that no information had been conveyed to the nonacting joint employer that would have put it on notice that the other joint employer's termination decision was unlawfully motivated. The General Counsel argues, however, that the Board made clear in *Capitol EMI Music* that if the reason for the termination that was given to the nonacting joint employer had "suggested a violation, *or if no reason had been given,* [the nonacting joint employer] would have had the burden of presenting some evidence of its efforts to ascertain the reason for the [termination]." Id. at 1001, fn. 23 [Emphasis added]. Here, the General Counsel contends that even though the Respondent knew (1) that Conroy and Matsinger had engaged in an unfair labor strike against it at the A-Bell jobsite and (2) that their employment had been terminated at A-Bell, the Respondent took no action to determine the reason for their termination or to separate itself from A-Bell's unlawful act. Accordingly, the General Counsel argues that the Respondent is jointly liable for A-Bell's failure to reinstate Conroy and Matsinger. For the following reasons, we agree.

Under the second prong of *Capitol EMI's* 2-part test, for liability to be imposed on the nonacting joint employer, the General Counsel must establish that the other joint employer's termination decision was discriminatorily motivated. Here, however, that motive element is not required. The judge found, and we agree, that Conroy and Matsinger were unfair labor practice strikers[9] who informed A-Bell on June 25 that they were unconditionally ending their strike and offering to return to work. In these circumstances, A-Bell was not legally free to discharge them, but was required to reinstate them upon this June 25 request. Thus, it is well settled that the denial of reinstatement to unfair labor practice strikers upon their unconditional offer to return to work is "inherently destructive" of the strikers' Section 7 rights without regard to the motive for the denial. See *NLRB v. Fleetwood Trailer Corp.,* 389 U.S. 375, 379–380 (1967), citing *NLRB v. Great Dane Trailers,* 388 U.S. 26 (1967) and *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270 (1956). Accordingly, by establishing that A-Bell and the Respondent are joint employers, and that A-Bell refused to reinstate unfair labor practice strikers Conroy and Matsinger upon their unconditional offer to return to work, we find that the General Counsel satisfied his burden under *Capitol EMI Music* by establishing that A-Bell had engaged in inherently destructive conduct.

We also find, under the standards set forth in *Capitol EMI Music,* that the Respondent failed to meet its burden

of showing that it neither knew nor should have known of A-Bell's unlawful action. On the facts of this case, we find that the Respondent had sufficient information to impose on it the duty to inquire as to the reason Conroy and Matsinger were no longer employed at A-Bell. The Respondent knew that the two employees had engaged in an unfair labor strike against it at A-Bell starting June 22 and had picketed the A-Bell jobsite with signs directed only at its unfair labor practices; and it knew that they were no longer working for A-Bell as of June 25. Thus, after they ended their strike, Conroy and Matsinger delivered their timecards for the A-Bell assignment to the Respondent and inquired about further work opportunities. The Respondent then issued paychecks to Conroy and Matsinger covering their employment at A-Bell and did not offer them further work. In these circumstances, particularly because the refusal to reinstate unfair labor practice strikers would be unlawful regardless of A-Bell's motive, we find that the Respondent was obligated to inquire as to the circumstances under which Conroy and Matsinger's employment at A-Bell ceased and thus should have known of A-Bell's unlawful conduct. Having failed to find out about and protest or reject A-Bell's unlawful conduct, the Respondent is jointly liable for A-Bell's failure to reinstate Conroy and Matsinger.[10]

ORDER

The National Labor Relations Board orders that the Respondent, Action Temporary Employment, a/k/a Action Multi-Craft, Wilmington, Newark, and Dover, Delaware, its officers, agents, successors and assigns shall

1. Cease and desist from

(a) Coercively interrogating employees and job applicants about their union involvement and activities.

(b) Refusing to consider, refer, or hire applicants for jobs because of their union membership.

(c) Refusing to reinstate unfair labor practice strikers after they unconditionally offer to return to work.

---

[9] Indeed, the Respondent did not except to this finding.

[10] We find our dissenting colleague's contrary arguments unpersuasive. His claim that the absence of an 8(a)(3) finding against A-Bell precludes a determination that the Respondent is jointly liable, ignores the reality of cases involving joint employers. In these cases, it is not unusual for one respondent to settle while litigation proceeds as to another that has declined to do so. See, e.g. *Urban Laboratories, Inc.,* 305 NLRB 987, 988 (1991). Further, there are sufficient facts found by the judge to establish the illegality of A-Bell's conduct: (1) Conroy and Matsinger were unfair labor practice strikers; (2) they made an unconditional offer to return to work for A-Bell; and (3) A-Bell's foreman refused their request.

Nor do we find merit in our colleague's argument that, under *Capitol EMI Music,* the information known by the Respondent was insufficient to require it to inquire into the circumstances under which Conroy and Matsinger ceased working for A-Bell. As discussed above, fn. 23 of *Capitol EMI* clearly compels such an inquiry.

4                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer applicants James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove, Edward Coleman III, David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan employment in positions for which they applied, or if such positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges they would have enjoyed.

(b) Make James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove, Edward Coleman III, David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan whole for any loss of earnings they may have suffered by reason of the discrimination against them as set forth herein and in the remedy section of the underlying decision.

(c) Offer James Conroy and Robert Matsinger immediate and full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(d) Make whole James Conroy and Robert Matsinger for any loss of earnings they may have suffered as a result of the unlawful refusal to reinstate these strikers after they unconditionally offered to return to work, as set forth herein and in the remedy section of the underlying decision.

(e) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(f) Within 14 days after service by the Region, post at its Wilmington, Newark, and Dover, Delaware offices

copies of the attached notice marked "Appendix."[11] Copies of the notice. on forms provided by the Regional Director for Region 4. after being signed by the Respondent's authorized representative. shall be posted immediately upon receipt and maintained for 60 consecutive days in conspicuous places. including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings. the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at· any time since June 6, 1995.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. December 20, 2001

| Wilma B. Liebman, | Member |
|---|---|
| Dennis P. Walsh, | Member |

(SEAL)        NATIONAL LABOR RELATIONS BOARD

CHAIRMAN HURTGEN, dissenting in part.

I agree with the judge that the Respondent cannot be held liable for the conduct of its joint employer, A-Bell Electric, Inc. in failing to reinstate John Conroy and Robert Matsinger. Under *Capitol EMI Music*, 311 NLRB 997 (1993), in order to find joint employer liability, the General Counsel must show that: (i) the two employers are joint employers; and (ii) one of the employers has, with unlawful motivation, discharged or taken other discriminatory actions against employees in the jointly managed work force. The burden then shifts to the nonacting joint employer to show that: (i) it neither knew, nor should have known, that the other employer had acted unlawfully; or (ii) if it knew, that it took all necessary measures within its power to resist the unlawful action.

---

[11] If this Order is enforced by a Judgment of a United States court of appeals, the words in the notice "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

In the instant case. the judge made no finding whether A-Bell (which settled the charges against it), violated Section 8(a)(3) by refusing to reinstate Conroy and Matsinger. Thus, I find that the General Counsel did not sustain his initial burden. Moreover, even assuming, arguendo, that A-Bell violated Section 8(a)(3), I agree with the judge that the Respondent met its rebuttal burden under *Capitol EMI Music*.

I recognize that the Respondent knew that Conroy and Matsinger had engaged in a strike, and that they were no longer working at A-Bell at the Avon site. However, this was not sufficient to establish that the Respondent knew, or should have known, that A-Bell had acted unlawfully toward them. Indeed, there are various reasons why Conroy and Matsinger may have ceased working for A-Bell at the Avon site: their work could have ended there; their work could have been unsatisfactory; they could have voluntarily quit their employment at that site; etc. Unlike the majority, I do not find the instant facts sufficient to impose an obligation on the Respondent to inquire into the conduct of A-Bell toward Conroy and Matsinger, let alone bear liability for A-Bell's conduct.

Accordingly, I would dismiss this allegation of the complaint.

Dated, Washington, D.C. December 20, 2001

Peter J. Hurtgen,                    Chairman

NATIONAL LABOR RELATIONS BOARD

## APPENDIX

### NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

Section 7 of the Act gives employees these rights.

To organize

To form, join, or assist any union

To bargain collectively through representatives of their own choice

To act together for other mutual aid or protection

To choose not to engage in any of these protected concerted activities.

WE WILL NOT coercively interrogate employees or job applicants about their union involvement and union activities.

WE WILL NOT refuse to consider, refer, or hire applicants for jobs because of their union membership.

WE WILL NOT refuse to reinstate unfair labor practice strikers after they unconditionally offer to return to work.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, within 14 days from the date of the Board's Order offer applicants James Kerrigan. Robert Lange, Jr., Robert Megonigal, Roger Colegrove, Edward Coleman III, David Mark Bryan, James Conroy, William Bryant, Jeffery Scott. John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan employment in positions for which they applied or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges they would have enjoyed.

WE WILL make James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove, Edward Coleman III, David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan whole for any loss of earnings and other benefits resulting from our discriminatory refusal to hire, less any net interim earnings, plus interest.

WE WILL offer James Conroy and Robert Matsinger immediate and full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

WE WILL make James Conroy and Robert Matsinger whole for any loss of earnings and benefits resulting from their discharge, less any net interim earnings, plus interest.

### ACTION TEMPORARY EMPLOYMENT, A/K/A ACTION MULTI–CRAFT

*Mark E. Arbesfeld, Esq.,* for the General Counsel.
*R. Scott Summers   David Crittenden, Esqs.,* of Greenwood, Indiana, for the Respondent.

### DECISION

#### STATEMENT OF THE CASE

KARL H. BUSCHMANN, Administrative Law Judge. This case was tried in Philadelphia, Pennsylvania, on October 9, 10, 11, and November 6, 1996, on a consolidated complaint dated

6                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

April 30, 1996, as further consolidated on September 5, 1996. The charges were filed by Local Union 654, International Brotherhood of Electrical Workers, AFL–CIO in Case 4–CA–23898 on June 6, 1995, and in Case 4–CA–23974 on June 27, 1994. Additional charges were filed by Local 313, International Brotherhood of Electrical Workers, AFL–CIO in Case 4–CA–240001 on July 3, 1995, and in Case 4–CA–24026 on July 11, 1995.

During the hearing on October 10, 1996, the Respondent, A-Bell Electric Company, Inc., and the charging parties agreed to an informal settlement of the charges. The General Counsel stated his support of the settlement and moved to sever Case 4–CA–24001 from this proceeding. I granted the motion and approved the settlement of the allegations relating to A-Bell Electric (G.C. Exh. 20). The General Counsel also moved to withdraw portions of the complaint and dismiss the allegations in the complaint contained in paragraph 7(a) and those portions of paragraph 10(a) which relate to Gilbert Lewis, James Corradin, and Danny Savina. I granted the General Counsel's motion dismissing the specified allegations of the complaint.[1]

The consolidated complaint alleges in substance that the Respondent, Action Temporary Employment, as joint employer of A-Bell Electric, Inc., violated Section 8(a)(1) of the National Labor Relations Act (the Act) by interrogating employee-applicants about their union membership and Section 8(a)(1) and (3) of the Act by failing to consider or refer for employment members of Local 313 (James Kerrigan, Robert Lange Jr., Robert Megonigal, Robert Colegrove, and Edward Coleman, III) and members of Local 654 (Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caligiuri Jr., Anthony Hartlage, Robert Matsinger, Daniel Minnick Jr., Gunner Webb, Robert West, William Jones, John Bondrowski, and John McCrohan). The complaint also alleges that the Respondent refused to reinstate Robert Matsinger and James Conroy in violation of Section 8(a)(1) and (3) of the Act.

The Respondent's answer, timely filed, admits several of the jurisdictional allegations in the complaint, and denies that it engaged in any unfair labor practices. The Respondent admitted the supervisory status of Jeff Rickerman.

On the entire record[2] in this case, including my observation of the demeanor of the witnesses and after consideration of the briefs filed by the General Counsel, and the Respondent, I make the following

FINDINGS OF FACT

I. JURISDICTION

The Respondent, Action Temporary Employment a/k/a Action Multi-Craft, a Delaware corporation, with offices in Wilmington, Newark, and Dover, Delaware, is engaged in the business of locating, placing, and employing temporary workers at other places of business. With services valued in excess of $50,000 to customers located outside the State of Delaware, the Respondent is admittedly an employer within the meaning

of Section 2(2), (6), and (7) of the Act. Action Temporary admitted that it is a single employer and/or alter ego of B&R, Inc.

The Unions, Local 654 and Local 313, are labor organizations within the meaning of Section 2(5) of the Act.

II. FACTS

Action Temporary Employment or Action Multi-Craft, the Respondent, is, as the name implies, an employment agency which recruits and hires temporary workers on behalf of clients. With headquarters in Wilmington, Delaware, and offices in Newark and Dover, Delaware, the Respondent accepts applications from prospective employees. Jack Boyd is the owner and Jeff Rickerman is the vice president of operations and dispatcher. In that capacity, Rickerman was responsible for the daily operations of the Company.

In early 1995 union members from two local unions of the IBEW submitted applications to Action Temporary seeking employment. The application forms provided by the Employer required an answer to the question whether the applicant had been involved with the union. None of the more than two dozen applicants who had revealed their union membership were hired or seriously considered for employment. Union members who had hidden their union affiliation during the application process were hired. Two union members who were fired staged a 1-day strike to protest the unfair hiring policy and were refused reinstatement to their jobs after they ended the strike and offered to return unconditionally.

The record shows that the Company's practice was to seek applicants on a continuing basis. Occasionally applications were solicited by advertisements, the distribution of leaflets, or by "word of mouth." Applications were accepted by the Respondent daily between the hours of 12 and 2 p.m. The members of Local 313 who submitted their completed applications and disclosed their union affiliation were not contacted for any consideration for employment and those few members who kept their union affiliation a secret were considered and in some instances offered a job. The applicants, James Kerrigan, Robert Lange Jr., Robert Megonigal, Robert Colegrove, and Edward Coleman, went to the Wilmington office where they were provided with application forms consisting of several pages of questions. One of the questions on page 6 of the application was question 2, "Have you ever been actively involved in a union?" The five applicants disclosed in their applications their active membership in Local 313. None of them were considered for employment, even though the Respondent admitted that they were qualified candidates for the jobs.

For example, *James Kerrigan* testified that on January 19, 1995, he went to the union hall looking for a job. Jim Clothier, the Union's organizer, told him that Action was accepting applications. Kerrigan completed the application provided him at Action's Wilmington office (G.C. Exh. 4). There, the Company's representative indicated that they were looking for electricians. In response to the question on the application about his union affiliation, Kerrigan wrote, "Yes, IBEW Local 313." After perusing the application, Action's representative told him "that he wasn't looking for electricians right now, but he would

[1] The General Counsel specifically referred to these three employees in Case 4–CA–24026 and par. 10(a) of the complaint to be withdrawn.

[2] The motion to correct transcript is hereby granted.

get in contact with me in the future." Kerrigan testified that he was never contacted by the Respondent, nor was he instructed to call Action Temporary repeatedly to keep his application current.

The Respondent does not contest that it had failed to contact Kerrigan for several months but maintains that the notations on his application indicate that the Company had attempted to contact Kerrigan on May 1 and June 20, 1995. I find Kerrigan's testimony to be credible that he was not notified of any job opportunity. Even if the notations are correct, it is clear that the Respondent failed to make an attempt to reach Kerrigan for at least 3 months after his application.

*Robert Lange Jr.* and *Robert Megonigal* each were members of Local 313 for more than 20 years when they applied on January 30, 1995, for jobs as electricians, because they were unemployed at that time. They had seen the Respondent's advertisement in the Wilmington News Journal seeking for electricians. Both electricians testified that they completed the employment questionnaire, including the question about their union involvement. They candidly replied that they were members of IBEW Local 313.

The application process lasted for more than 1 hour and included the presentation of a film about safety at work. Jeff Rickerman reviewed the applications and met with the applicants and informed them that he had no work for them at that time and that he would call them when jobs became available. Megonigal and Lange credibly testified that they never received a telephone call or any other communication from the Respondent.

The Company maintains that it attempted to make contact on May 1, 1995, with the applicants as noted on their application.

*Robert Colegrove*, a member of Local 313 for 12 years, was unemployed when he applied at Action Temporary on February 7, 1995. He was accompanied by Francis Clymer also a union member. However, only Colegrove disclosed his union affiliation in the application, by answering "yes, I.B.E.W." to the question whether he has "ever been actively involved in a union" (G.C. Exh. 9). Colegrove testified that he watched a movie on safety during his application process and handed his completed application to Rickerman. He told Colegrove that he would receive a call when work became available. The Respondent did not call this applicant until a month later. Rickerman called on a Thursday or Friday asking whether Colegrove was available for work. Colegrove replied that he could not start that day but that he was available on Monday. Rickerman then inquired whether his prior employment consists of union shops, Colegrove said yes. Rickerman then asked whether he was a union member and Colegrove again replied in the affirmative. Rickerman then said that he would get back with Colegrove by the afternoon. But the Respondent did not call, instead Colegrove called. Rickerman however said that he had no work. The Respondent never contacted Colegrove again.

In sharp contrast was Respondent's reaction to Clymer's application (G.C. Exh. 8). He had written "No" in answer to the question about his union affiliation and listed wages lower than union scales. Clymer received a message from Action Temporary at around March 15, 1995. Clymer did not respond to the

message. At the end of March, Action Temporary left another message and inquired if he wanted a job. Clymer returned the phone call and told them that he was working. In May, the Respondent contacted Clymer and offered him a job with Globe Electric. Clymer worked for about 2 weeks and then quit his job. Thereafter, the Respondent has called him on several occasions with other job offers.

*Edward Coleman*, also a longstanding union member of Local 313, had heard from his union that the Respondent was accepting applications. He applied at Respondent's Wilmington office on March 27, 1995, completed the application and answered, "Yes, I.B.E.W." to the question about his union involvement (G.C. Exh. 10). Rickerman told him that he had work for electricians and would call within a few days. The Respondent, however, never contacted Coleman.

In summary, the records show that Local 313 members Kerrigan, Lange, Megonigal, Colegrove and Coleman submitted their applications in person and expressly indicated on their written application forms that they were affiliated with Local 313. None of them were offered jobs or seriously considered for employment. Other Local 313 members who had concealed their union involvement, Gilbert Lewis (G.C. Exh. 3), Danny Savina (G.C. Exh. 7), and Francis Clymer were contacted within weeks of their application and considered for employment. Indeed, Clymer actually worked for the Respondent. Lewis had simply removed the page on this application which inquired about his union involvement. Within 2 weeks, he received a call from Rickerman offering him an electrician's helper position. Savina responded "No" to the question about the union. Beginning in March, the Respondent contacted Savina on several occasions with job opportunities.

The 15 members of Local 654 who applied for jobs with Action Temporary experienced the same treatment as the union members just discussed. Union members (Mark Bryan, James Conroy, William Bryant, Jeff Scott, John Clark, Russ Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Gunner Webb, Robert West, William Jones, John Bondrowski, and John McCrohan) went personally to the Respondent's offices and filled out applications which in all but two instances contained the question about the applicants' union involvement.

*James Conroy*, president of Local 654, noticed the Respondent's advertisements for electricians in early 1995. On February 20, 1995, he called the Company's Wilmington office and was told that Action was hiring electricians. On the following day, he (Conroy), David Mark Bryan, William Bryant, and Jeff Scott went to the Company's Wilmington office, met Jeff Rickerman, and filled out applications for electrician positions. One of the applicants, David Mark Bryan wore a Local 654 shirt. In answer to the question on the application about union involvement, Conroy revealed his prominent union background, including his position as president and organizer. Conroy asked Rickerman about his job opportunities and Rickerman replied that he expected to have work within 2 weeks.

On March 23, 1995, Conroy accompanied three additional union members, including Russel Fox and John Clark, to the Respondent's Wilmington office where they applied for employment. Conroy asked Rickerman where he stood in regard

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

to being employed. Rickerman said that he was Number 25 and gave an otherwise vague answer. On March 27, Conroy called the Wilmington office saying that he was still looking for an electrician's job. Rickerman "got off the phone and he came back and he said. 'Are you still with the Union?'." Conroy answered that he was still with Local 654 and Rickerman told them to call the Respondent's Newark office. Conroy called the Respondent's Newark and Dover offices and was told by the receptionist that electrician jobs were available.

On March 30, 1995, Conroy brought several more union members (Daniel Minnick, Anthony Hartlage, Robert Matsinger, and Vincent Caliguiri) to the Respondent's Wilmington office in search for work. On that occasion Rickerman indicated that he expected to have work available within 2 weeks. Conroy went to the Respondent's office on April 6 and May 1, 1995, with additional members of Local 654 who applied for work.

During one of the his visits to the Respondent's offices, Conroy met John Boyd, the owner of Action Temporary. However, after a brief conversation, Rickerman interrupted the meeting to avoid any further conversation between the two men. Rickerman then asked Conroy whether he would be interested to work as an electrician's helper. Conroy agreed to accept the job, but the Respondent never contacted Conroy with a job offer until June 20. On that day, the Respondent called Conroy and union member Robert Matsinger, and they accepted a job with A-Bell Electric. Conroy and Matsinger worked 1 day and then went on strike on June 22, 1995, in protest over the Respondent's unfair labor practices of refusing to hire union members, as more fully discussed below. Thereafter, Conroy was not contacted again by the Respondent for employment.

Union member *David Mark Bryan* was one of the electricians who with Conroy applied for work at the Respondent's Wilmington office on February 21, 1995. Bryan wore a Local 654 shirt and wrote "Yes, on organizing com. of Local 654 I.B.E.W." on his application as his response to the question about his union involvement (G.C. Exh. 11). Rickerman had indicated that he would be in touch in a couple of weeks, but he never contacted Bryan for a job. A notation on Bryan's application shows, "6-20-95 called and offered work left mess" as an indication of Respondent's effort to contact Bryan. But, according to Bryan's testimony, and a telephone record of the Respondent's long distance calls, the Respondent did not attempt to contact Bryan.

*Jeffery Scott* was among the February 21, 1995 applicants. As a member of Local 654, he also revealed his union affiliation on his application, stating, "yes, I.B.E.W. Local Union 654 Examining Board" (G.C. Exh. 12). Scott similarly testified that Rickerman had assured the group that he would be in contact with them in a couple of weeks. Scott was never contacted until June 20, when he was already employed elsewhere.

The other member of the group was *William Bryant*, a union member for 38 years, who responded, "Yes organized" to the question in the application relating to his union involvement (G.C. Exh. 13). Bryant testified that Rickerman said the following during the meeting on February 21:

He told us that he had work in the next couple of weeks. He was waiting for blueprints to come in for the

job, and as soon as they came in—and they would be in within the next couple of weeks—he'd be giving us a call. He'd need plenty of people.

Bryant heard nothing from the Respondent until June 20, when the Company called and asked whether he was available for work. The following conversation ensued (Tr. 179):

He says, "Well, I may need you for work on Monday." I said, "Well, I can't go to work before Monday, because I still got tomorrow to work." He said, "Well, where did you get your call from?" I said, "Through the union hall." I said, "I'm a union member." He said, "Thank you," and hung up the phone.

When asked whether the Respondent ever called after that, Bryant testified, "Never after that, no."

*John Clark* is a member of Local 654 who, accompanied by Conroy, applied for an electrician's position on March 21, 1995, at the Wilmington office. Like the other applicants, he completed the employment application and stated, "Yes IBEW Lo[cal] 654 Member" (G.C. Exh. 14). Clark testified that Rickerman indicated that work would be available in 2 weeks because he was waiting for blueprints and that he would be contacted. The Respondent did not contact Clark until June 20. Clark received a message on that day, and he returned the message on the following day, leaving his name, number, and an indication that he was interested in a job. But the Respondent never called thereafter.

*Russell Fox Jr.* applied at Action Temporary on March 23, 1995, after he had visited the union hall in search for work. At Conroy's suggestion, he accompanied the other electricians and filled out the employment questionnaire, including the inquiry about his union involvement, stating "Local Union 654 Organizing Committee, Executive Board Local Entertainment Committee" (G.C. Exh. 15). Fox also testified about Rickerman's promises about calling him as soon as work would be available. Yet not until June 20 did he get a message from the Respondent. At that time Fox was on vacation and did not contact the Company.

*Daniel Minnick Jr.* was unemployed and visited his union hall on March 30, 1995. Conroy suggested that he apply at Action Temporary. Minnick went to the Wilmington office, obtained the application form from Rickerman, and, like the other applicants, answered the question about his union connections. His answer was, "Yes - Union organizing - Work out of Hall" (G.C. Exh. 21). Rickerman told Minnick that he might have a job in a couple of weeks. Minnick received a message from Action Temporary in late June and returned the call several days later. But Minnick was never contacted again.

*Robert Matsinger*, like several other union members, was out of work and learned through his union hall that the Respondent was looking for electricians. He applied at the Wilmington office on March 30, 1995, and responded to the question on the employment form about his union affiliation, "Yes member Local 654 IBEW" (G.C. Exh. 22). Rickerman informed Matsinger that he would get in touch with him. On June 20, Matsinger received a message from Action Temporary about a job. Matsinger called the Respondent but received no answer.

He went to his union hall where he and Conroy contacted Rickerman at Action Temporary the following day. Rickerman told him about a job and they started work on June 21. 1995. at A-Bell Electric in Newark, Delaware. Matsinger went out on strike with Conroy to protest the Respondent's unfair labor practices as discussed below.

*Anthony Hartlage* was seeking employment in March 1995 and learned from his union hall that Action Temporary was accepting applications for electricians. He applied on March 30, 1995, at the Wilmington office along with several other members of Local 654. His application shows that he was affiliated with the Union. In response to the question on the application about his union background, he wrote "Yes, IBEW Lo[cal] 654 Organizing Committee" (G.C. Exh. 25). Hartlage never heard from Action Temporary.

*Vincent Caliguiri Jr.* was among the group of unemployed union members who applied for work at Action Temporary on March 30, 1995. His response to the union question on the application was, "Yes, Union organizing and working out of Hall (G.C. Exh. 26). Rickerman told him that he would be called if a position became available. The Respondent may have made an attempt to contact him on June 20, 1995, but Caliguiri was not at home to receive a call.

*Harold William Jones* applied at Respondent's Wilmington office on April 6, 1995. Conroy had advised him about the job opportunity and accompanied Jones and several other members of Local 654. During the application process Jones answered the questionnaire about his union involvement, "Yes I.B.E.W. Lo[cal] 54" (G.C. Exh. 24). Jones handed the completed application to Rickerman who appeared impressed by Jones' experience as an electrician. Rickerman told him that he would be in touch with him. On June 20, 1995. the Respondent contacted Jones about a job. Jones returned the call promptly and went to the union hall where he learned that the Respondent had already filled the available positions.

*Gunner Webb*, another member of Local 654 applied for work as an electrician along with Jones and several other members of Local 654 on April 6, 1995. He completed the same application questionnaire and answered the question about his union membership as follows, "Yes I.B.E.W. Local 654" (G.C. Exh. 27). Webb does not recall receiving a message from Action Temporary. The Company's records indicate that a call was made on June 20. At that time Webb was already employed elsewhere.

*Robert West* also applied for an electrician's position on April 6 after Local 654 informed him that the Respondent was accepting applications. In response to the question on the employment form whether he had been involved with a union, he noted, "Yes Organizer" (G.C. Exh. 29). Not until June 20, 1995, did he receive a call from Action Temporary about a job. West responded to the telephone inquiry that he would be available for work on Monday. The Respondent, however, did not contact him again.

All applicants at this point had been confronted with an application form which specifically asked about their union involvement. As of May 1, 1995, the Respondent had revised its application form so that the question no longer appeared on the form. Nevertheless, two members of Local 654 applied for

employment on May 1, 1995, and indicated their union background on the new form.

*John McCrohan* was unemployed and visited his Local 654 hall in search for work. He learned from Conroy that an opportunity existed at Action Temporary. McCrohan completed the revised application form and indicated on the first page that he was an "Electrician Local 654 IBEW" (G.C. Exh. 30). According to his testimony, McCrohan overheard the conversation as Rickerman spoke to Conroy about a helper's position. Conroy agreed to accept the helper's position and also made the statement that all Local 654 applicants would accept a helper's job. The only communication following the application was a telephone call on June 20 in reference to the A-Bell job. McCrohan, however, was already employed elsewhere by that time.

Like the previous applicant, *John Bondrowski*, applied for an electrician's position on May 1, 1995. Because he was unemployed at that time, he had come to the union hall of Local 654 and learned that Action Temporary was looking for electricians. On the first page of his application, Bondrowski revealed his union affiliation, stating "from Local #654 I.B.E.W." (G.C. Exh. 31). Bondrowski testified that he heard the conversation between Rickerman and Conroy where the latter emphasized that he and all other applicants would accept a helper's position. However even though Rickerman indicated that such jobs were available, he, Bondrowski was not contacted. He testified that he may have missed a meeting on June 20 because he had moved.

The Respondent's conduct with respect to the union applicants just discussed who had revealed their union affiliation on their applications differed from the treatment accorded William Scott who had avoided the disclosure of his union membership. Scott had been a member of Local 654 for 13 years and applied on April 13, 1995, at the Dover office. Kevin Kowal (Cole), Respondent's agent, informed Scott that Action Temporary needed qualified electricians and that he would be employed shortly. Scott was contacted a week later and offered a job by the Respondent at Globe Electric. Scott was transferred by Action Temporary after several weeks to Globe's Wilmington location and worked a total of about 2 months and resigned his employment for personal reasons. The Respondent has called Scott on several occasions since his resignation even though he had indicated that he was no longer interested in temporary work.

The record shows in summary that during the relevant time period the Respondent has hired electricians who had concealed their union affiliation. These candidates did not have to wait for months for Respondent's message, but were employed within a time span of a week or two. Examples of such individuals are: Gilbert Lewis, a union member, who concealed his membership. He applied on January 9 and was called within a few weeks and offered an electrician's helper job; Danny Savina, a union member, who applied on February 6 without disclosing his union background and was contacted in March and April 1995 with job opportunities; Francis Clymer, a union member who did not reveal his union background, and was contacted twice in March after applying in February 1995 and ultimately worked at Globe Electric in May 1995; William

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Scott, a union member who also concealed his union background on his April 1995 application. He began work for the Respondent within a week.

Moreover, the Respondent hired numerous applicants who had no union background. Applicants without union backgrounds who were offered jobs were William Robinson who applied on January 11, 1995, and began work on March 22, 1995; Daniel Wells applied on February 27, 1995, and began his employment on May 14, 1995; Thomas Gill applied on March 13 and began on March 22, 1995; Horst Horn applied March 16 and began on March 26, 1995; William Constanzo applied on March 29 and began on April 9, 1995; Tyrone Ware applied on April 12 and began on May 17, 1995; Jack Houston applied on July 5 and received work on July 16, 1995; and Charles Heilander applied on March 17, 1995, and began work on March 22, 1995. These applicants were employed as electricians during the time when all union applicants who had honestly conveyed their background were denied employment. The record also shows that the union applicants were highly skilled and whose qualifications in many instances exceeded those who were hired. Indeed, Rickerman conceded in his testimony that he considered the union applicants well qualified.

### III. ANALYSIS

#### A. Interrogation

The allegation in the complaint that the Respondent coercively interrogated job applicants in violation of Section 8(a)(1) of the Act is fully supported by the record. As already described, each applicant was required to complete a lengthy questionnaire, with instructions to "[a]nswer those additional questions honestly and accurately;" "Have you ever been actively involved in a union? If yes, please explain." The interrogation of a prospective employee who is seeking employment is inherently coercive and clearly irrelevant to his qualifications. Most of the electricians answered the question, but some felt constrained and concealed their union background. This question is clearly not relevant to a person's ability, skill, productivity, and reliability as an employee and was clearly designed to interfere with a candidate's chance of being hired. The Board has held that such conduct constitutes coercive interrogation. *Culley Mechanical Co.*, 316 NLRB 26 (1995).

Moreover, when on March 27, 1995, Rickerman questioned Conroy over the telephone whether he was still with the Union, the Respondent engaged in additional interrogation under coercive conditions, because it occurred during a job interview. *Casey Electric, Inc.*, 313 NLRB 774, 785 (1994). I accordingly find, in agreement with the General Counsel, that the Respondent violated Section 8(a)(1) of the Act.

#### B. REFUSAL TO HIRE

With respect to the allegations in the complaint that the Respondent violated Section 8(a)(3) for refusing to consider and refer for employment members of the two local unions, I can hardly imagine a stronger prima facie case of unlawful discrimination. The Union applicants testified that they were unemployed at the time of their applications. Their testimony showed that they were making a serious and honest attempt to

find work. They testified in a consistent manner about the cumbersome application process, requiring answers to a series of questions. They were required to take a test and watch a movie about safety. The record contains the copies of the applications of each discriminatee showing his qualifications and his answers to the question about the union involvement. With the exceptions of two applicants who had voluntarily disclosed their union affiliation on the first page of their applications, each of the remaining discriminatees revealed their union background in answer to the printed question. None of them were contacted by the Company prior to the June 20 date. Those applicants who had concealed their union connections and the candidates without any union background were hired. In short, the Respondent had jobs available and sought applicants through advertising, but it refused to consider any applicant known to have a union connection. Respondent's union animus was clearly established by the Respondent's unlawful interrogation and obvious disparate treatment of these applicants.

The Respondent's testimony was simply implausible and unconvincing. Rickerman testified that he offered helper positions to the applicants. Yet the record shows that the only contacts made were messages made on June 20. Only three positions were available and filled with Conroy and Matsinger and an employee named Hurst Horn. Moreover, Conroy testified, as did several applicants, that they would have accepted a helper's position. Rickerman also testified that he informed all applicants to call him and badger him about job opportunities, however, the consistent scenario of all applicants who testified was that Rickerman told them that he would contact them when a job opportunity was available. Indeed the individuals who were hired were contacted by Rickerman and not vice versa. Respondent argues that the three offices, Wilmington, Dover, and Newark, are autonomous and that its Wilmington office did not need electricians. But the record shows that the advertised positions identified the Wilmington address. The Wilmington office operated as the Company's principal office, where the Company "does payroll, pays the bills, administrative type of work" and generally does the billing (Tr. 672). Certain individuals who applied at the Wilmington office were assigned to the Newark office. The Respondent also argues that it has employed other union members and refers to four individuals, including Daniel Wells and Don Lindsay (R. Exhs. 44, 63), and also other employees who were not even employed as electricians but as laborers or helpers. The Respondent even refers to so called union members who, with respect to the union question, gave such responses as, "not in any more," or "just in work union" and "just a member, AFL–CIO" (R. Exhs. 66, 69, 70). In any case, it is clear that the Respondent's employment of few individuals with a union background does not indicate that it did not discriminate in its employment practice. *KRI Constructors, Inc.*, 290 NLRB 802 (1988).

In sum, the General Counsel has shown the Respondent's knowledge of the applicants' union affiliation as a result of the unlawful interrogations, the Respondent's anti-union animus, and the failure to hire qualified electricians with a union background. Respondent has failed to show that it would have refused to employ the named discriminatees even in the absence of any union motivation. *Wright Line*, 251 NLRB 1083 (1980).

11

## C. Refusal to Reinstate

The Respondent referred Jim Conroy and Robert Matsinger for employment at A-Bell Electric on June 21, 1995. Both men began work on that day for A-Bell at Avon Products in Newark, Delaware, which is located near Respondent's Newark office. The Respondent's Newark representatives gave timecards to Conroy and Matsinger and instructed them to get the timecards signed by A-Bell's foremen on the job and to submit them to Action Temporary's Wilmington office. The Respondent and A-Bell have supervisory authority in directing the employees' job performance. While Conroy testified that either Company had the authority to discharge him and Matsinger. I accept Rickerman's testimony that A-Bell would more likely inform Action Temporary that an undesirable employee not be referred again. A-Bell controlled the hours of work of both employees and also made the work assignments. The Respondent referred to A-Bell as a client. The employees' timecards contained detailed provisions about the relationship between Action and A-Bell (G.C. Exh. 17). In a letter dated July 11, 1995, to the Regional office, A-Bell confirmed that Action Temporary supplied the two individuals on its jobsite and described them as employees of Action Temporary. The record clearly shows that an employer-employee relationship existed between Action Temporary and the two employees while they worked for A-Bell. The record also shows that such a relationship existed between A-Bell and the two employees, because its foreman, Louis Wright took charge of their work as soon as he picked them up at the guard desk. He assigned the work to them on the Aron project and the new conveyor system and as Conroy explained in his testimony, "starts laying the job out to us." Clearly, both companies had retained sufficient control of the terms and conditions of employment of the two employees. I accordingly agree with the General Counsel that both companies while operating as independent legal entities must be considered joint employers with respect to Conroy and Matsinger. *NLRB v. Browning-Ferris Industries*, 691 F.2d 1117 (3d Cir. 1982).

The two employees worked for A-Bell on June 21, 1995. On the following day, June 22, 1995, Conroy and Matsinger picketed at the Avon facility and went on strike in protest over the unfair labor practices of Action Temporary in refusing to refer union applicants for employment as contained in the June 6, 1995 charge filed with the Labor Board. The picket signs stated, "Action Temporary Employment Service[s], unfair labor practice. Strike" (Tr. 259). The picketing lasted from 6:30 a.m. to 10 a.m. on June 22 and continued on June 23, during the same hours. There was no picketing on June 23 and on June 24. Conroy and Matsinger reported for work on June 25 and informed Louis Wright that they were unconditionally ending the strike. Wright informed them, "You've been dismissed by Action and you've been permanently replaced by Tri-County Electric" (Tr. 282). The employees were not recalled for work. They handed in their timecards at Action Temporary and were paid.

A-Bell had informed Action Temporary about the employees' strike activity and Rickerman admitted knowing about the strike. Rickerman testified that he took no steps to contact A-Bell about the status of the employees and admitted that they

were not referred for work thereafter. This was consistent with the Company's letter, dated February 21, 1996, to the Board's Regional Office wherein the Company stated its "policy that any worker leaving a job and failing to return thereafter will *not be* hired again (G.C. Exh. 33).

The General Counsel properly cites *Capitol EMI Music*, 311 NLRB 997 (1993), and argues that an inference can be drawn so as to hold A-Bell and Action Temporary jointly responsible for the refusal to reinstate the two employees after they offered to return unconditionally following their unfair labor practice strike.

Assuming that the strike at one employer in protest of the other, joint employer's conduct was a lawful unfair labor practice strike, the evidence does not show that the Respondent knew or should have known of the employees' unconditional offers to return to work. The two employers are not a single employer but joint employers and are separate entities. In *Capitol EMI*, supra, the Board observed that in only two cases has it ever found a violation of Section 8(a)(3) by two joint employers by imputing the motive of one to the other. The record in this case, does not show that A-Bell was ever informed or knew of the employees' discharge by Action Temporary,[3] nor does the record support a finding that the Respondent was informed about the unconditional offer to return to work. There was no contractual obligation between the joint employers to keep each other informed about their respective labor policies. Where, as here, the General Counsel has shown (a) that A-Bell and Action Temporary were "joint employers" of the two employees and (b) "that one of them has, with unlawful motivation," taken discriminatory action against the employees. the burden shifts to the employer that it neither knew nor should have known of the reasons for the other employer's action. *Capitol EMI*, supra. In my view, the Respondent has carried that burden. I would, therefore, dismiss the allegations in the complaint dealing with the Respondent's refusal to reinstate Robert Matsinger and James Conroy.

### CONCLUSIONS OF LAW

1. The Respondent, Action Temporary, is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act

2. A-Bell Electric which entered into a settlement agreement was a joint employer with Action Temporary.

3. Local 654 and Local 313 are labor organizations within the meaning of Section 2(5) of the Act.

4. By interrogating employee-applicants through the use of employment forms, and by interrogating an employee during a job interview, the Respondent violated Section 8(a)(1) of the Act.

5. By refusing to consider or refer for employment members of Local 313 (James Kerrigan, Robert Lange Jr., Robert Mcgonigal, Robert Colegrove, and Edward Coleman III), because of their union involvement, the Respondent violated Section 8(a)(1) and (3) of the Act.

---

[3] The General Counsel relies upon hearsay testimony in this regard, namely the employees' testimony about the statements made by the Respondent to A-Bell.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

6. By refusing to consider or refer for employment members of Local 654 (David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan, because of the union involvement, the Respondent violated Section 8(a)(1) and (3) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

Having found that the Respondent unlawfully refused to consider and refer for employment the named applicants because of their union affiliation, it must be ordered to consider and refer the employees for employment. The record showed that the Respondent had a continuing need for qualified electricians and considering that the Respondent hired numerous electricians during the relevant time, it is clear that jobs were available for these applicants. I find it appropriate to recommend the traditional remedy, including reinstatement and backpay. *Ultrasystems Western Constructors v. NLRB*, 18 F.3d 251 (4th Cir. 1994); *BE&K Construction Co.*, 321 NLRB 561 (1996). I accordingly recommend that the Respondent be ordered to offer immediate employment in the positions for which they applied and that they be made whole for any earnings lost by reason of the discrimination against them from the date of the refusal to hire to a bona fide offer of reinstatement, backpay should be computed on a quarterly basis as prescribed in *F. W. Woolworth Co.* 90 NLRB 289 (1950), plus interest as computed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987). On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[4]

### ORDER

The Respondent, Action Temporary Employment, a/k/a Action Multi-craft, Wilmington, Newark, and Dover, Delaware, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Coercively interrogating employees and job applicants about their union involvement and activities.

(b) Refusing to consider, refer, or hire applicants for jobs because of their union membership.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer the applicants for the positions for which they applied James Kerrigan, Robert Lange Jr., Robert Magonigal, Robert Colegrove,

Edward Coleman III, David Mark Bryant, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan or, if such positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights or privileges they would have enjoyed.

(b) Make James Kerrigan, Robert Lange Jr., Robert Magonigal, Robert Colegrove, Edward Coleman III, David Mark Bryant, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan whole for any loss of earnings they may have suffered by reason of the discrimination against them as set forth herein and in the remedy section of the underlying decision.

(c) Preserve and, within 14 days of a request, make available to the Board or its agents for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports, and all other records necessary to analyze the amount of backpay due under the terms of this Order.

(d) Within 14 days after service by the Region, post at its Wilmington, Newark, and Dover, Delaware offices copies of the attached notice marked "Appendix."[5] Copies of the notice, on forms provided by the Regional Director for Region 4, after being signed by the Respondent's authorized representative, shall be posted immediately upon receipt and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 6, 1995.

[5] If this Order is enforced by a Judgment of a United States Court of Appeals, the words in the notice "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

(e) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C. December 20, 2001.

---

[4] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

---

[5] If this Order is enforced by a Judgment of a United States Court of Appeals, the words in the notice "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

13

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

Section 7 of the Act gives employees these rights.

To organize

To form, join, or assist any union

To bargain collectively through representatives of their own choice

To act together for other mutual aid or protection

To choose not to engage in any of these protected concerted activities.

WE WILL NOT coercively interrogate employees or job applicants about their union involvement and union activities.

WE WILL NOT refuse to consider, refer, or hire applicants for jobs because of their union membership.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, within 14 days from the date of the Board's Order, offer the applicants for the positions for they applied (James Kerrigan, Robert Lange Jr., Robert Magonigal, Robert Colegrove, Edward Coleman III. David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski and John McCrohan or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges they would have enjoyed.

WE WILL make James Kerrigan, Robert Lange Jr., Robert Magonigal, Robert Colegrove, Edward Coleman III. David Mark Bryant, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan whole for any loss of earnings and other benefits resulting from our discriminatory refusal to hire, less any net interim earnings, plus interest.

ACTION TEMPORARY EMPLOYMENT

*Mark E. Arbesfeld, Esq.,* for the General Counsel.
*R. Scott Summers and David Crittenden, Esqs.* of Greenwood, Indiana, for the Respondent.

## SUPPLEMENTAL DECISION

KARL H. BUSCHMANN, Administrative Law Judge. On June 7, 2000, the Board remanded this proceeding to me for further consideration in light of its decision in *FES (A Division of*

*Thermo Power), 331* NLRB No. 20 (2000). and for appropriate action and for a supplemental decision setting forth credibility resolutions, findings of fact, conclusions of law, and a recommended Order, as appropriate.

### FINDINGS OF FACT

In an Order to Show Cause, dated August 18, 2000, I directed the parties to show cause on or before September 30, 2000, why my decision, issued on June 30, 1997, is not in accord with the Board's holding in *FES* and, further, to show what changes, if any, are necessary (pertinent portions attached as Appendix A).

On September 26, 2000, the General Counsel, the only party to file a response, submitted Counsel for the General Counsel's Response to the Order to Show Cause (pertinent portions attached as Appendix B). The General Counsel stated therein, "that the ALJD is entirely consistent with the Board's 'framework for analysis' *Id.,* slip op. at 4, and that no changes are necessary with respect to the refusal-to-hire allegations." In a careful analysis, counsel for the General Counsel compared the Board's holding in *FES* with the findings of my decision and concluded, "that *FES* supports the refusal-to-hire findings and conclusions made by the ALJ and that no changes are needed to the ALJD."

I have re-examined my decision, as directed by the Board, to assure that it is consistent with the Board's decision in *FES,* and I have so concluded for the following reasons:

The decision sustained the allegations in the complaint that the Respondent, Action, as joint employer with A-Bell Electric, Inc.,[1] "has refused to consider or refer for employment" the named individual union applicants. As fully discussed in my decision, the record clearly shows that the Respondent, Action, while performing personnel services on behalf of A-Bell Electric, including the hiring of electricians, discriminated against applicants who had revealed their union background. As stated in my decision, "[t]hose applicants who had concealed their union connections and the candidates without any union background were hired." Under this scenario, where Action, acting as joint employer, was in the process of hiring applicants, but refused to consider the discriminatees for employment and also refused to refer them for jobs, its conduct amounted not only to a refusal to consider but a refusal to hire.[2] As noted in my decision, the Respondent was seeking applications on a daily basis during the relevant time of the alleged unlawful conduct. Twelve applicants were hired during that time, as fully described in my decision. However, none of the 20 union applicants were considered for employment, even though they admittedly were well qualified. They were highly skilled with qualifications, which in many instances exceeded those of the ones hired by the Respondent. As discussed in my decision, the Employer had interrogated the applicants about their union background during the application process in violation of Section 8(a)(1) of the Act and was obviously aware of the union affiliations of the applicants. Antiunion animus, clearly shown

---

[1] A-Bell Electric, Inc. agreed to an informal settlement and is therefore not a Respondent in this matter.

[2] My finding in this regard required minor changes in the Conclusions of Law and the Order, as shown herein.

by the unlawful interrogations and the disparate treatment of the applicants, contributed to the Respondent's decision not to hire the applicants.

The Respondent's failure to show that it would not have hired the applicants even in the absence of their union activities, as stated in the decision, met the criteria under *FES* to establish that the Respondent. Action, violated Section 8(a)(1) and (3) of the Act.

### CONCLUSIONS OF LAW

1. The Respondent, Action Temporary, is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Local 654 and Local 313 are labor organizations within the meaning of Section 2(5) of the Act.

3. By interrogating employee-applicants through the use of employment forms, and by interrogating an employee during a job interview. the Respondent violated Section 8(a)(1) of the Act.

4. By refusing to consider, refer for employment, or hire members of Local 313 (James Kerrigan, Robert Lange. Jr., Robert Megonigal, Roger Colegrove, and Edward Coleman III). because of their union involvement, the Respondent violated Section 8(a)(1) and (3) of the Act.

5. By refusing to consider, refer for employment, or hire members of Local 654 (David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan), because of the union involvement, the Respondent violated Section 8(a)(1) and (3) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

Having found that the Respondent unlawfully refused to consider, refer for employment, or hire the named applicants because of their union affiliation, it must be ordered to consider. refer and hire the employees for employment. The record showed that the Respondent had a continuing need for qualified electricians and. considering that the Respondent hired numerous electricians during the relevant time, it is clear that jobs were available for these applicants. Even if the number of applicants had exceeded the number of available jobs, the reinstatement question would be handled in a compliance proceeding. I find it appropriate to recommend the traditional remedy. including reinstatement and backpay. *FES (A Division of Thermo Power)*, 331 NLRB No. 20 (May 11, 2000); *Ultrasystems Western Constructors v. NLRB*, 18 F.3d 251 (4th Cir. 1994); *BE&K Construction Co.*, 321 NLRB 561 (1996). I accordingly recommend that the Respondent be ordered to offer immediate employment in the positions for which they applied and that they be made whole for any earnings lost by reason of the discrimination against them from the date of the refusal to hire to a bona fide offer of reinstatement, backpay should be

computed on a quarterly basis as prescribed in *F.W. Woolworth Co.*, 90 NLRB 289 (1950). plus interest as computed in *New Horizons for the Retarded*. 283 NLRB 1173 (1987).

On these findings of fact and conclusions of law and on the entire record. I issue the following recommended[3]

### ORDER

The Respondent. Action Temporary Employment, a/k/a Action Multi-Craft, Wilmington, Newark, and Dover, Delaware, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Coercively interrogating employees and job applicants about their union involvement and activities.

(b) Refusing to consider, refer, or hire applicants for jobs because of their union membership.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer the applicants for the positions for which they applied James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove, and Edward Coleman III, David Mark Bryan, James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage. Robert Matsinger, Daniel Minnick. Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan, or if such positions, no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights or privileges they would have enjoyed.

(b) Make James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove. Edward Coleman III, David Mark Bryan. James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox, Vincent Caliguiri, Anthony Hartlage. Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan whole for any loss of earnings they may have suffered by reason of the discrimination against them as set forth herein and in the remedy section of the underlying decision.

(c) Preserve and. within 14 days of a request, make available to the Board or its agents for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports. and all other records necessary to analyze the amount of backpay due under the terms of this Order.

(d) Within 14 days after service by the Region, post at its Wilmington, Newark, and Dover, Delaware offices copies of the attached notice marked "Appendix."[4]  Copies of the notice,

---

[3] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings. conclusions and recommended Order herein shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[4] If this Order is enforced by a Judgment of a United States Court of Appeals, the words in the notice "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the

15

on forms provided by the Regional Director for Region 4. after being signed by the Respondent's authorized representative, shall be posted immediately upon receipt and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered. defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 6, 1995.

(e) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. December 20, 2001.

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

Section 7 of the Act gives employees these rights.

To organize

To form, join. or assist any union

To bargain collectively through representatives of their own choice

To act together for other mutual aid or protection

To choose not to engage in any of these protected concerted activities.

WE WILL NOT coercively interrogate employees or job applicants about their union involvement and union activities.

WE WILL NOT refuse to consider, refer, or hire applicants for jobs because of their union membership.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL within 14 days from the date of the Board's Order, offer the applicants for the positions for they applied James Kerrigan, Robert Lange, Jr., Robert Megonigal, Roger Colegrove. and Edward Coleman III, David Mark Bryan. James Conroy, William Bryant, Jeffery Scott. John Clark. Russell Fox, Vincent Caliguiri, Anthony Hartlage, Robert Matsinger. Daniel Minnick, Jr., Gunner Webb, Robert West, Harold William Jones, John Bondrowski, and John McCrohan, or, if those

United States Court of Appeals Enforcing an Order of the National Labor Relations Board.

positions no longer exist. to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges they would have enjoyed.

WE WILL make James Kerrigan. Robert Lange, Jr., Robert Megonigal, Robert Colegrove. and Edward Coleman III, David Mark Bryan. James Conroy, William Bryant, Jeffery Scott, John Clark, Russell Fox. Vincent Caliguiri, Anthony Hartlage, Robert Matsinger, Daniel Minnick. Jr., Gunner Webb, Robert West, Harold William Jones. John Bondrowski, and John McCrohan. whole for any loss of earnings and other benefits resulting from our discriminatory refusal to hire. less any net interim earnings, plus interest.

This is an official notice and must not be defaced by anyone.

ACTION TEMPORARY EMPLOYMENT A/K/A ACTION
MULTI-CRAFT

### APPENDIX A

### ORDER TO SHOW CAUSE

The Board has remanded this matter for consideration in light of its decision in *FES* (A Division of Thermo Powers). 331 NLRB No. 20 (2000). The parties are directed to show cause on or before September 30, 2000, why my Decision is not in accord with the Board's holding in *FES* and, further, to show what changes. if any, are necessary.

Dated at Washington. D.C.. this 18th day of August. 2000.

### APPENDIX B

### COUNSEL FOR THE GENERAL COUNSEL'S RESPONSE TO THE ORDER TO SHOW CAUSE

#### INTRODUCTION

On June 7, 2000, the Board remanded this proceeding to the Administrative Law Judge for further consideration in light of *FES (A Division of Thermo Power)*, 331 NLRB No. 20 (2000). On August 18, 2000, the Administrative Law Judge issued an Order to Show Cause why his Decision, herein called the ALJD, is not in accord with *FES* and to show what changes, if any, are necessary. Counsel for the General Counsel submits that the ALJD is entirely consistent with the Board's "framework for analysis" *Id.*, slip op. at 4, and that no changes are necessary with respect to the refusal-to-hire allegations.[1]

[1] This response does not deal with the dismissal of the allegations concerning the failure of Respondent Action Temporary Employment, a/k/a Action Multi-Craft, herein called Respondent, to reinstate or refer discriminates James Conroy and Robert Matsinger after June 25, 1995; and the related conclusions concerning Respondent's awareness of A-Bell Electric, Inc.'s notification to Conroy and Matsinger that they had been dismissed by a-Bell and permanently replaced. Those issues are the subject of Counsel for the General Counsel's Cross-Exceptions and do not involve the refusal-to-hire analysis necessitated by *FES*.

16                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*I. The FES Framework for Analysis*

FES REQUIRES THE GENERAL COUNSEL TO SHOW

(1) that the respondent was hiring, or had concrete plans to hire, [footnote omitted] at the time of the alleged unlawful conduct; (2) that the applicants had experienced or training relevant to the announced or generally known requirements of the positions for hire, . . . and (3) that antiunion animus contributed to the decision not to hire the applicants. FES. slip op. at 4.

Once these elements are established the burden shifts to the respondent to show that it would not have hired the applicants even in the absence of their union activity or affiliation. *Id.* If the respondent fails to make this showing, a violation of Section 8(a)(3) has been established. With respect to antiunion animus, a finding can be based on all of the circumstances, and need not depend on "direct evidence." *Id.* Slip op. at 4, fn. 8.

In cases involving numerous applicants, the General Counsel need only show that one applicant was discriminated against to establish a refusal-to-hire violation warranting only a cease-and-desist order. However, if the General Counsel seeks an affirmative backpay and "instatement" order, he must show that there were openings for the applicants. *Id.* at 6. This does not mean that the General Counsel must show one opening for each applicant. "Where the number of applicants exceeds the number of available jobs, the compliance proceeding may be used to determine which of the applicants would have been hired for the openings." *Id.*

*II. Application of the FES Framework for Analysis to the ALJD*

The ALJ concluded that respondent Action was hiring at the time of the alleged unlawful conduct. There were 20 Union applicants for positions.[2] The ALJ further noted Respondent's admission that all of these applicants were "qualified candidates for the job" (ALJD at 3, line 45; see also ALJD at 9, line 40) and that the "union applicants were highly skilled and whose qualifications in many instances exceeded those who were hired." (ALJD at 9, lines 37–40). The ALJ found that Respondent coercively interrogated all of the applicants by means of its application questionnaire. and, additionally, in a telephone conversation with James Conroy on March 27, 1995. (ALJD at 10, lines 7–11).

[2] IBEW Local 313 members James Kerrigan, Robert Lange, Jr., Robert Megonigal, Robert Colegrove, Edward Coleman, III; and IBEW Local 654 members Mark Bryan, James Conroy, William Bryant, Jeffrey Scott, John Clark, Russell Fox, Vincent Caliguiri, Jr., Anthony Hartlage, Robert Matsinger, Daniel Minnick, Jr., Gunner Webb, Robert West, William Jones, John Bondrowski and John McCrochan (ALJD at 3, lines 39–40; ALJD at 5, lines 24–27).

The ALJ further concluded that applicants who disclosed their union affiliation "were not contacted for any consideration for employment and those few members who kept their union affiliation a secret were considered and in some instances offered a job." (ALJD at 9, lines 3–40). Some of those who obtained jobs, and who had not made known their Union affiliation. were called several times after they resigned to see if they would accept other job offers. (ALJD at 9, lines 12–14, 22, 24; ALJD at 10, lines 40–41). In another instance, applicant William Bryant was told in a telephone call that he was needed for work on a Monday. When Bryant said he could not report before Monday because he had to work the next day. Bryant was asked where he got his call from. When Bryant responded that the call had come from the union hall, and that he was a union member, Respondent's Vice President Jeff Rickerman said "Thank you." and hung up the phone. (ALJD at 6, line 50).

The ALJ concluded

Respondent's union animus was clearly established by the Respondent's unlawful interrogation and obvious disparate treatment of these applicants. (ALJD at 10, lines 30–31).

Thus. all for the elements needed under *FES* to support the ALJ's findings of refusal-to-hire violations were made in this proceeding. Respondent failed to show that it would not have hired the applicants even in the absence of their union affiliations.

Finally. the ALJ found that 123 applicants. who either hid their union affiliation from Respondent or were not union members, were hired during the relevant time periods.[3] It is not necessary at this stage for the General Counsel to establish which of the 20 applicants would have received these 12 jobs. Under *FES*. this determination can be left for the compliance proceeding if one is necessary.

*III. Conclusion*

For the reasons set forth above. it is submitted that *FES* supports the refusal-to-hire findings and conclusions made by the ALJ and that no changes are needed to the ALJD.

Dated September 22, 2000

[3] Gilbert Lewis, Danny Savina, Francis Clymer, William Scott, William Robinson, Danield Wells, Thomas Gill, Horst Horn. William Costanzo, Tyrone Ware, Jack Houston and Charles Heilander (ALJD at 9, lines 5–35).

# EXHIBIT 3

FORM NLRB-31
(1/03)



### SUBPOENA DUCES TECUM

## UNITED STATES OF AMERICA
## NATIONAL LABOR RELATIONS BOARD

To **Action Temporary Employment, ATTN: John Boyd, President**

    **207 Louis Lane, Hockessin, DE   19707**

As requested by **Dorothy L. Moore-Duncan, Regional Director**

whose address is _____**615 Chestnut Street, 7th Floor, Philadelphia, PA   19106**_____

      (Street)             (City)        (State)    (ZIP)

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE __**a Board Agent**__

_____ of the National Labor Relations Board

at _____**615 Chestnut Street, 7th Floo**_____

in the City of _____**Philadelphia, Pennsylvania**_____

on the ___**16th**___ day of_____**December**_____ 20__**04**___ at ___**10:00**___ (a.m.)~~(p.m.)~~ or any adjourned

or rescheduled date to testify in **Action Temporary Employment a/k/a Action Multi-Craft**

             **Cases 4-CA-23898, 4-CA-24026, 4-CA-22974 and 4-CA-24001**

(Case Name and Number)

    And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

    **SEE ATTACHED RIDER**

In accordance with the Board's Rules and Regulations, 29 C.F.R. Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings), objections to the subpoena must be made by a petition to revoke and must be filed as set forth therein. Petitions to revoke must be received within five days of your having received the subpoena. 29 C.F.R. Section 102.111(b) (3). Failure to follow these regulations may result in the loss of any ability to raise such objections in court.

## B- 438191

    Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at     **Philadelphia, Pennsylvania**

this **2nd** day of     **December**           20__**04**___

*Robert J Battista*

**NOTICE TO WITNESS.** Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

EXHIBIT 3



## RIDER

1.   Those showing the name(s); most recent address(s); hours worked; the type of work performed; the location where the work was performed; and the rate of pay for all electricians employed by, or employees performing electrical work for, Action Temporary Employment a/k/a Action Multi-Craft (herein called Respondent) during the period from March 1, 1995 to the present time.

2.   The amounts and dates of any wage increases given to the electricians or employees of Respondent referred to above in paragraph 1 during the period from March 1, 1995 to the present time.  If any employee was promoted or transferred or reassigned from one job title to another, indicate the date of the promotion, transfer or reassignment and change in rate of pay, if any.

3.   Those showing the weekly or bi-weekly compensation paid by Respondent to the electricians or employees of Respondent referred to above in paragraph 1 during the period from March 1, 1995 to the present time.

4.   The payroll records for the electricians or employees of Respondent referred to above in paragraph 1 during the period March 1, 1995 to the present time.

5.   Those showing all bonuses or other forms of compensation given to the electricians or employees of Respondent referred to above in paragraph 1 during the period March 1, 1995 to the present time.

6.   Those showing benefits provided by Respondent to its electricians or employees referred to above in paragraph 1 from March 1, 1995 to the present time.

7.   In lieu of the books, records, correspondence and documents referred to above in paragraphs 1, 2, 3 and 5, Respondent may provide a signed statement setting forth the desired information provided that the pertinent books, records, correspondence and documents are made available to Board Agents for the purpose of checking the accuracy of the statement.

The terms "books, records, correspondence and documents" as used in this subpoena include information contained solely in audio and visual recordings and computer records, including electronic mail. Such computer records shall be provided in printed form if possible. If not possible, such information shall be provided as a Word for Windows or Excel document file or in ASCII or dBase form.

# EXHIBIT  4

**RETURN OF SERVICE**

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

(Check method used.)

- ☒ by person
- ☐ by certified mail
- ☐ by registered mail
- ☐ by telegraph
- ☐ by leaving copy at principal office or place of business

at: _____

_____

_____

on the named person on

✓ __Dec 8, 2004__
(Month, day, and year)

✓ __Daniel S. Rafter__
(Name of person making service)

✓ __Asst. Bus. Manager / Organizer__
(Official title, if any)

__LU. 654 IBEW__

**CERTIFICATION OF ATTENDANCE**

I certify that the named person was in attendance as a witness at __207 Louis Ln.__

__Hockessin Dt__  __19707__

on __Dec 8, 2004__
(Month, day or days, and year)

__Daniel Savina__
(Name of person certifying)

__Organizer LU. 313 IBEW__
(Official title)

**EXHIBIT 4**

TOTAL P.21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NATIONAL LABOR RELATIONS BOARD:

              Applicant,

        v.

JOHN BOYD and ACTION TEMPORARY
EMPLOYMENT a/k/a ACTION
MULTI-CRAFT

              Respondent.

Misc. No. 05-

## ORDER TO SHOW CAUSE

The National Labor Relations Board, herein called the Board, having filed its Application with this Court for an order requiring John Boyd, President of Action Temporary Employment a/k/a Action Multi-Craft, to comply with a certain subpoena duces tecum duly and properly served upon it in connection with *NLRB v. Action Temporary Employment a/k/a Action Multi-Craft.*, No. 02-3157 (3d Cir. 2002, enfg. 337 NLRB 268 (2001)), as set forth in the Application, and good cause appearing therefor,

**IT IS HEREBY ORDERED,** that John Boyd, an agent of Action Temporary Employment a/k/a Action Multi-Craft., appear and show cause, if any there be, at the United District Court for the District of Delaware, Courtroom _____ , J. Caleb Boggs Federal Building, 844 N. King Street, Wilmington. Delaware, on the _____ day of _____ 2005, at ___.m., why an Order of this Court should not issue directing John Boyd to comply with the subpoena served upon him in regard to *NLRB v. Action Temporary Employment a/k/a Action Multi-Craft.,* No. 02-3157 (3d Cir. 2002, enfg. 337 NLRB 268 (2001)), by appearing before a Board Agent of the National Labor Relations Board at such time and place as the Board Agent may designate, and then and there produce the books, papers, records, and other documents

described in the subpoena duces tecum served on him and give testimony in connection with the proceeding now pending before the Board pursuant to the National Labor Relations Act, amended (29 U.S.C. § 151, *et seq.*), and

      **IT IS FURTHER ORDERED** that service on John Boyd or on Respondent of a copy of the Order to Show Cause and a copy of the Application upon which it is issued, be made on or before the _____ day of _____ 2005, by service thereof on John Boyd, or on any agent of his or of Respondent, and that he or his agent, or Respondent or its agent, shall file and serve its answer to the Application no later than_____, 2005.

Dated at Wilmington, Delaware this _____ day of _____ 2005.

 

                                       _____

                                       **UNITED STATES DISTRICT JUDGE**